**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No: 19-03665-5-SWH |
| Keith Douglas Sanders. | ) | |
| | ) | Chapter 7 |
| Debtor-in-Possession. | ) | |
| | ) | |
| First Recovery LLC & Dylan Brooks | ) | |
| | ) | |
| Creditor. | ) | |
| FIRST RECOVERY, LLC and | ) | |
| DYLAN BROOKS | ) | ADVERSARY PROCEEDINGS |
| | ) | COMPLAINT |
| Creditors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEITH DOUGLAS SANDERS, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

NOW COME the Creditors First Recovery, LLC ("First Recovery") and Dylan Brooks ("Brooks") (collectively the "Creditors"), by and through counsel and pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and 11 U.S. Code § 523, and complain of Debtor Keith Douglas Sanders ("Sanders") and objects to the discharge of debts owed to Creditors First Recovery and Brooks, as follows:

**FACTUAL ALLEGATIONS**

1.      First Recovery, LLC, ("First Recovery") is a corporation organized and existing under the laws of the State of North Carolina and having its principal place of business in Wake County, North Carolina.

2.      Dylan Brooks is the managing member of First Recovery and is a resident and citizen of Forsyth County, North Carolina.

3. Unlimited Rec-Rep, LLC ("URR"), is formerly known as Unlimited Recovery Repossession Division, LLC and is a limited liability company established under the laws of the State of North Carolina, comprised of a sole member, Keith D. Sanders, with its principal office in Wake County, North Carolina.

4. Keith D. Sanders ("Sanders") is a citizen and resident of Wake County, North Carolina.

5. Richie, Inc., is a corporation organized and existing under the law of the State of North Carolina and doing business as "Sunbelt of Raleigh", a business brokerage firm ("Sunbelt").

6. On or about August 13, 2004, Sanders formed Unlimited Recovery, LLC, ("Unlimited Recovery"). Unlimited Recovery provided towing and asset recovery (or repossession) services under the name "Unlimited Recovery."

7. On or about June 17, 2010, Sanders formed Unlimited Recovery Repossession Division, LLC a/k/a URR.

8. During 2010 and presumably after the formation of URR, Sanders sold the towing division Unlimited Recovery to third parties, Tad Lowdermilk and Will Schien, but retained the repossession and recovery business under URR.

9. During 2011, Sanders marketed URR as a business that grossed $1.4 million in annual revenue. During 2011, Sanders markets URR through Sunbelt.

**PRIOR FINANCIAL MISREPRESENTATIONS WITH THE CRAFTS**

10. In the Business Summary Report offered by URR and transmitted by Sunbelt in 2011 ("2011 Report"), Sanders and Sunbelt falsely represented URR was established in the Year 2000 and that URR was "ranked second in the state of NC for number of repossessions per

year by their valued financial institutions." The 2011 Report further asserts, "Their first four major clients are 4 of the largest banks in the country. (Grade A paper) In 2010, the following revenues came in from Client #1 - $415,064; Client #2 - $278,399; Client #3 - $176,875; Client #4 - $82,375." The Report further states the drivers have 10-plus years of experience in the industry. The Business Summary Report also states, "A financial spreadsheet with 2008 and 2009 information from income taxes is available for registered buyers."

11.    At this time, URR and Sanders falsely represented the true income of the URR as the spreadsheets contain income from the towing division (previously sold to Lowdermilk and Schien).

12.    The 2008 and 2009 tax returns for Unlimited Recovery, a separate business (part of which had been sold to Lowdermilk and Schein), had not been prepared at that time and would not properly reflect URR's income and revenue.

13.    Based on the financial representations of URR, Sanders and Sunbelt, on May 15, 2011, Jordan Craft, Linda Craft and Ray Craft (collectively "the Crafts") and Keith Sanders entered into Offer to Purchase with URR and Sunbelt acting as broker. Throughout the transaction, Sunbelt and its agent, Jim Martinez, acted as agent for Sanders and URR.

14.    In order to purchase URR, the Crafts obtained a loan through the Small Business Administration ("SBA").

15.    In the course of convincing the Crafts to purchase URR and to eventually close the transaction, Sanders and URR began a campaign of providing false and

fraudulent representations to Crafts and their lenders. Most of the fraudulent representations were transmitted by Sunbelt.

16.    On September 9, 2011, Sanders signed a 2011 YTD Profit & Loss Statement showing $730,732 in revenue. He also signed a Balance Sheet dated June 30, 2011 showing $247.820 in cash, $93,852 in accounts receivables and $674,532 in equity. These 2011 YTD Profit & Loss Statements later prove to be fraudulent.

17.    On October 11, 2011, URR of NC, Incorporated (a company formed by the Crafts), as buyer, entered into the Agreement of Purchase and Sale of Assets with Unlimited Recovery Repossession Division, LLC, with Keith D. Sanders and Debra N. Sanders (spouse of Sanders) as Sellers.  Having denied the existence of any client contracts, Sanders failed to assign any of URR's existing contracts to URR of NC. At closing, Sanders received payment of $1,008,249.48.

18.    On October 31, 2011, just twenty days after closing, Jordan Craft logged into the Recovery Database to see actual revenues on the system versus the revenue represented by URR, Sanders and Sunbelt. The Recovery Database is the software program used by URR to show all recovery activity, including number of cars repossessed and revenue generated.

19.    According to the Recovery Database, the revenue from January 1, 2011 to August 31, 2011 was $448,830.14. URR, Sanders and Sunbelt represented that income was $968,102.00.

20.    Jordan Craft also ran the revenue for October 2011. Monthly revenue shows $52,205.00, far less than the $120,000 average represented by URR, Sanders and Sunbelt.

21.    Jordan Craft also ran the revenue from the database for January through December 2010. It shows revenue of $732,413.75, not the represented $1,413,878.00.

22.    The Crafts then quizzed the remaining employees of URR, who were then working for URR of NC, regarding the discrepancy of income. Robyn N. Coleman and Christopher J. Wilson, employees with URR and its prior entity, Unlimited Recovery, disclosed that all repossession revenue is logged into Recovery Database. Ms. Coleman states that she has entered all repossession orders into the recovery database. Ms. Wilson stated that she has invoiced all repossession work to the various clients. Office Manager Leah Braugham stated that 200 repossessions a month (or 2,400 a year) was the norm, not the 3,500 a year represented by URR, Sanders and Sunbelt.

23.    On November 3, 2011, concerned that the financial representations may be inaccurate, the Crafts began running reports for URR for the years 2008 and 2009. Reports showed total revenue of $182,170.24 for 2008 and $359,432.70 for 2009. Reports for 2010 and the first half of 2011 showed similar discord between the amounts represented by Sanders and the amount actually invoiced by URR and Unlimited Recovery.

24.    The Crafts also discovered that URR and Sanders had forged a number of the Lessor Consents, purportedly assigning leases from URR to the Crafts.

25.    On or about November 15, 2011, the Crafts filed suit against URR and Sanders, alleging breach of contract, breach of express warranty, fraud, and unfair and deceptive acts and practices.

26.    When confronted with revenue shown in the Recovery Database, Sanders offered the Crafts a second set of books called "Unlimited Recovery Repossession Sales" (in Quickbooks) that purported show additional revenue from purported sales of repossessed property.

27.    In November 2011, the Crafts employed Certified Forensic Examiner Derek Ellington, who began an analysis of the URR sales Invoices 1198 through 1270 to determine when

they were created. Based on the date contained in the files, the sales invoices purportedly showing additional revenue in 2010 and 2011 were created in the hours between November 18, 2011 at 9:32:45 AM to November 19, 2011 at 2:40:01 AM. A copy of Ellington's Affidavit and the accompanying exhibits are attached here as Exhibit A and incorporated herein.

28.     Even though he was previously confronted with direct evidence that he created false financial statements and conjured false invoices for the years 2009, 2010 and 2011, URR and Sanders would later use those same numbers to defraud Brooks.

**FINANCIAL MISREPRESENTATIONS WITH BROOKS**

29.     On or about October 6, 2014, Sanders, again using Sunbelt as the broker, provided Brooks with a Business Summary Report ("2014 Report"). Like the 2010 Report Sunbelt provided to the Crafts, the 2014 Report had a number of false and fraudulent misrepresentations:

   a.   Repossession & Resale was established in February of 2000.

   b.   They were ranked second in the state of NC for number of repossessions per year by their valued financial institutions.

   c.   The first four major clients are the largest banks in the country

   d.   2 Office Employees a Billing Specialist paid $11 per hour and Update Specialist paid $10.00 per hour. 1 Marketing/Transportation Specialist paid $12 per hour.

   e.   Owner oversees the business and only fills in in an emergency.

30.     Again through Sunbelt, in or about October 2014, Sanders provided Brooks with spreadsheets and balance sheets that fraudulently represented the finances of the company. In particular, Sanders provided Brooks with the same fraudulent financials for 2009, 2010 and 2011 that Sanders had provided to the Crafts and that the Crafts had found fraudulent. The 2014 Report

and accompanying spreadsheet are attached collectively as Exhibit B and incorporated herein by

reference. The spreadsheet shows the following "net revenues" :

| | |
|---|---|
| 2009 | $1,362,840 |
| 2010 | $1,413,878 |
| 2011 (ten months) | $1,225,789 |

31.     According to the Revenue Database, the true repossession revenues for those years

are as follows:

| Year | Represented | Reported |
|---|---|---|
| 2009 | $1,362,840 | $359,432.70 |
| 2010 | $1,413,878 | $732,413.75 |
| 2011 (ten months) | $1,225,789 | $630,889.14 |

32.     Sanders had previously provided these same fraudulent figures to the Crafts.

33.     Brooks and First Recovery relied on the representations made in the 2014 Report

and the accompanying spreadsheets and such reliance was reasonable.

34.     Based on those representations, Brooks submitted an Offer to Purchase with

Sanders and URR for the sales price of $1,300,000.00 on December 23, 2014 through Sunbelt. The

Offer to Purchase is attached as Exhibit C. According to the Amendment/Addendum to the Offer to

Purchase, the offer was contingent on the following:

a.   Satisfaction with books and records of business for 2011, 2012, 2013 and Profit and

Loss Statements of 2014.

b.   Satisfactory Lease and Lease Assignments

35.     During the due diligence period, Sanders refused to allow Brooks or his agents

access to the URR records and business operations. Had Brooks been able to fully review the

business, including the Recovery Database, Brooks would have discovered the disastrous state of

business affairs of URR prior to closing and would have not closed on the purchase of the business.

36.	Brooks had no information regarding the previous lawsuit by the Crafts against URR and Sanders. Sanders told Brooks he repurchased URR from the Crafts because the Crafts neglected the business and because Sanders did not want to see the business he built go under and the employees without jobs. Sanders also told Yadkin Bank that Sanders repurchased URR because of his "love" for the business he built.

37.	Brooks relied on these representations in determining to purchase the business.

38.	In order to obtain financing to purchase URR, Brooks applied for a SBA loan through Yadkin Bank. During the underwriting process, Sanders provided the same false financial reports for 2009, 2010 and 2011 to Yadkin Bank that they had provided to the Crafts. Upon information and belief, Yadkin Bank reasonable relied upon these false financials in approving the underwriting for the SBA loan.

39.	Sanders also provided Brooks and Yadkin Bank with copies of URR's purported tax returns for 2013 and Profit/Loss Statement for 2014. Those purported 2013 tax returns shows income of $1,248,380, and the 2014 P/L shows repossession income of 1,300,111.61.

40.	After the closing, Brooks, like the Crafts, discovered that revenues were not matching the representations of URR and Sanders. Brooks checked the Recovery Database and found that URR had the following repossession revenues:

| Year | Represented | Reported |
|------|-------------|----------|
| 2013 | $1,362,840.00 | $1,072,161.76 |
| 2014 | $1,455,083.00 | $1,263,415.60 |



Actual vs. Reported Revenues

41.     Relying on the material false representations and omissions by Sanders, which were reasonably relied upon by Brooks, Brooks entered an Asset Purchase Agreement ("Agreement") with URR and Sanders on July 30, 2015, in which Brooks agreed to purchase URR from Sanders for the sales price of $1,300,000.00. The Agreement is attached hereto as Exhibit D and incorporated herein by reference.

42.     As part of the assets under the Agreement, URR agreed to transfer "leasehold interests and improvements," "customer and supplier business arrangements" and "goodwill and going concern value."

43.     In the Agreement, Sanders made the following material warranties:

a.  Seller is not in breach or default of any contract or arrangement assigned, assumed, or continued pursuant to this Agreement. Seller is not insolvent, is able to pay its debts as they accrue and is not contemplating bankruptcy.

b.  The Seller warrants that it is the owner of the Assets and that the Assets are free from any adverse lien, judgment, security interest or encumbrances except as set out in this Agreement and that Seller will defend the Assets against all claims and demands of all persons at any time claiming the same as any interest in the Assets and indemnify Buyer for any expenses, including attorney fees, incurred in defending the Assets against any such claim.

c.  Seller has operated the business in the normal course up and until the date of closing. Immediately prior to closing and thereafter Seller has not taken and will not take actions which directly or indirectly are designed to detrimentally affect the Assets, good will, name or business relationship of the business.

d.  Seller is not aware of any threatened or pending litigation, including outstanding injunctions or restraining orders, which could impact the Assets or the operation of the business.

e.  Seller is not in default of the lease or any contract and by selling the Assets, Seller is not breaching any agreement.

f.  The financial records and documents provided to Buyer prior to closing are and were generated according to GAAP and are accurate.

g.  All warranties and representations contained in this Agreement are material, are inducements to Buyer to enter this Agreement, and shall survive closing. Seller shall indemnify and hold Buyer from any and all claims, demand liabilities, expense,

payment, damage or deficiency resulting from any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant by Seller in this Agreement.

44.     At closing, Sanders failed to provide assignments to the five leases for the lots used to store cars.

45.     In addition to failing to assign the leases, Sanders also failed to obtain permission to assign its contracts with its clients to First Recovery and failed to transfer the $1,000,000 client protection bond to First Recovery as required by the Agreement.

## URR CONTRACTUAL BREACHES
## WITH EVEREST BUSINESS FUNDING AND SANTANDER BANK

46.     On or about September 15, 2014, URR and Sanders applied for a $40,000.00 loan from Everest Business Funding ("Everest"), whereby URR agreed to make daily payments of $466.67 to repay the loan. URR and Sanders applied for the loan, using the name "URRD, LLC". There is no "URRD, LLC" listed with the North Carolina Secretary of State.

47.     In order to obtain the loan, URR and Sanders agreed to secure the loan with the "all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments and inventory" of the "Debtor". On the UCC-1, the Debtor is identified as "URRD, LLC".

48.     On or about September 19, 2014, Sanders received the loan proceeds of $40,000.00. Sanders used the loan proceeds not only for URR but for his personal expenses and expenses of other businesses owned by him.

49.     Within a few weeks, URR and Sanders defaulted under the terms of the loan agreement.

50.     Sanders did not disclose the Everest loan, the purported security interest or the repayments to First Recovery and Brooks, as required by the Agreement or pursuant to GAAP standards. Further, Sanders never had the intent to repay the Everest loan.

51.     In addition to breaching its agreement with Everest, Sanders has breached his loan agreement with Santander Bank, N.A.

52.     Although Santander Bank was to be paid at closing, Brooks received a notice of default letter dated January 4, 2016, demanding immediate payment of $4,871.20 or it would seek repossession of collateral.

53.     Sanders had knowledge of this outstanding balance and potential lien on the assets he conveyed to Creditors, yet Sanders refused to pay the balance.

54.     Sanders failed to notify Creditors of the balance or the demand for payment.

### SANDERS NAVIGATES URR INTO FINANCIAL FREEFALL

55.     Having Brooks committed as a buyer and an imminent closing date, Sanders then neglected URR business and allowed it to go into a financial freefall.

56.     URR had entered a contract with PAR, Inc., d/b/a Par North America ("PAR") on or about September 19, 2012 to provide PAR with repossession services ("PAR Agreement"). In 2014, PAR was a top client of URR, representing approximately 33.9% of its revenues.

57.     Pursuant to the express terms of the PAR Agreement, URR agreed to provide timely reports to PAR regarding repossessions and agreed to have Workers Compensation coverage of $1,000,000.

58.     Although URR was technically in breach of contract for failing to have workers compensation coverage, PAR appears to be unaware of that fact. Instead, the revenue from PAR drops significantly in 2015 because Sanders and URR neglect its business.

59.     Prior to closing, Sanders failed to maintain contact with PAR, thereby taken actions which directly or indirectly are designed to detrimentally affect the assets, good will, name or business relationship of the business.

60.     From January 2015 to July 2015 (the closing date), URR only receives $79,193 in revenue from PAR, dropping PAR from 33.9% to 12.1% of revenue.

61.     Due to the failure of Sanders to maintain contact with PAR and return its phone calls, PAR stopped doing business with URR altogether.

62.     The PAR Agreement further requires that the performance under the Agreement not be reassigned or by subcontractor by any manner. URR is in breach of the PAR Agreement by (1) using subcontractors for the work to be performed by URR and (2) failing to obtain a written assignment approved by PAR for the continued work under PAR Agreement by First Recovery.

63.     Sanders would later claim that First Recovery was not getting any business from PAR because PAR itself had lost business to Primeritus, a competitor to PAR.

64.     PAR was not the only client that URR and Sanders ignored in the months leading to the closing in July 2015. URR and Sanders also failed to properly maintain the relationship with Wells Fargo bank.

65.     In 2014, URR received revenues of $88,374 from Wells Fargo. However, from January 2015 to July 2015, URR only received $16,350 in revenues from Wells Fargo.

66.     After closing, Brooks discovered that Wells Fargo had ceased doing business with URR because Sanders and Brougham had failed to appear for a mandatory inspection required by Wells Fargo.

67.     Sanders failed to notify Creditors that URR had lost the business of both PAR and Wells Fargo prior to closing.

68.    In addition to losing PAR and Wells Fargo as clients, URR and Sanders have overseen a general decline of sales directly attributable to their failure to conduct the business as an ongoing concern.

69.    URR has experienced a serious decline of business since late 2014 and into 2015. The number of repossessed vehicles is as follows:

| Date | 1/14 | 2/14 | 3/14 | 4/14 | 5/14 | 6/14 | 7/14 | 8/14 | 9/14 | 10/14 | 11/14 | 12/14 | 1/15 | 2/15 | 3/15 | 4/15 | 5/15 | 6/15 | 7/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cars | 334 | 251 | 278 | 257 | 243 | 277 | 288 | 267 | 306 | 289 | 222 | 233 | 261 | 187 | 228 | 204 | 170 | 147 | 179 |

70.    URR experienced a 40% drop in business in the months prior to closing, information that should have been disclosed under the Agreement. Yet Sanders purposefully failed to inform Creditors of the financial freefall of the business.



Navigating URRD Into Financial Abyss

71. Sanders failed to notify Creditors that URR could not assign its clients to First Recovery. Both ALS and Credit Acceptance terminated their contracts immediately upon discovering that Sanders had sold the assets of URR to First Recovery and Brooks.

72. After the closing, Brooks has attempted to rebuild the business; however, despite great efforts, the business has not performed as represented by Defendants due to the acts and omissions by URR and Sanders prior to closing.

73. Since the closing, Brooks convinced some clients to return and has obtained new clients. Nevertheless, the business was unsustainable with its debt load because of the fraudulent and/or negligent misrepresentations made by Sanders.

74. Creditors eventually closed the business, due to losses.

**FRAUD REGARDING OFFICE HOURS, OFFICE PERSONNEL AND TRUCKS**

75.     In the Business Summary Report, Sanders represented that "Owner oversees the business and only fills in in an emergency."

76.     In written and verbal communications with Sanders, Sanders repeatedly represented that he only spent 12-20 hours a week on the business. In an email on March 24, 2015, he confirmed his limited hours working.

77.     Sanders and Sunbelt further represented that business was run by three office workers.

78.     Sanders knew that Brougham worked for URR, as shown in an email dated July 10, 2013, in which Sanders informs Sunbelt that "Leah is part of this company."

79.     During the due diligence period, Brooks discovered that URR appeared to have employed Brougham at the annual salary of $60,000.00. Brougham has a high school diploma, no college degree or no special training.

80.     Given the amount of the salary, Creditors attempted to discern whether this salary should be considered an ongoing office expense for URR.

81.     On March 24, 2015, Sanders represented that Brougham "works for both my companies she took salary $60,720 which Dylan will no longer need her." Sanders represented that Brougham worked as a property manager for Platinum Properties of NC, LLC, another limited liability company controlled by Sanders. He also wrote, "Here is the lady who was #4 in office which you will not need. She no longer works for Urrd, she works for my other company now. You can add back the amount $60,720."

82.     Since the July 2015 closing, Creditors discovered that Brougham has been intimately involved in the operation of URR, including the attendance of a "trade show" in Las

Vegas, Nevada in June 2015. Moreover, URR's clients, former clients and the Crafts have confirmed that Brougham acted as the office manager of URR.

83.     URR, Sanders and Sunbelt repeatedly misrepresented that Brougham was not a working employee of URR.

84.     On or about February 5, 2015, John-Paul Schick, attorney for Sanders, issued an opinion letter to Yadkin Bank which contains a number of false representations regarding the employees.

85.     First, Attorney Schick opined that drivers employed by URR are "independent contractors." He states, "Theses companies or individuals are independent contractors, as they provide and own the vehicles and equipment they use, determine their own schedule and methods of repossession, and are paid on a negotiated flat rate, per-vehicle basis." The only true portion of that statement is the compensation of the drivers. URR owned the vehicles and set the terms of schedule and method of recovery.

86.     Second, Attorney Schick stated that the tax liens attached to URR and Sanders have been satisfied by Tad Lowdermilk, the purchaser of Sander's towing company. Contrary to the letter, the tax obligations and subsequent liens had always been the obligation of URR and Sanders. Sanders paid the tax liens at closing under protest. Lowdermilk never "satisfied" the tax liens.

87.     In addition to intentional misrepresentations regarding the staff and personnel of URR, Sanders failed to disclose that they had modified with the electronic control module ("ECM") on the tow trucks that govern the performance of the truck engines. Sanders had instructed one of the drivers to change the performance norms on the ECM to enhance power and performance.

88.     While flashing the ECM and replacing it with non-factory software may increase gas mileage and power, it may also cause significant damage to the engines and transmissions of the

trucks. Sanders failed to disclose to Creditors that they had changed the software on these important assets.

89. According to the website, www.overdriveonline.com, such reprogramming leads to following damage:

> Re-flashing your ECM or remotely advancing injection timing and the quantity of fuel that goes in for each power stroke could certainly give an underpowered, fuel-thirsty truck a boot in the rear. It's also bound to send Nox emissions through the roof and, along with them, peak cylinder pressures and the amount of heat your cooling system and engine oil will have to remove from cylinder liners, pistons and other parts. A drastic increase in power is likely to significantly increase oil soot, caused by the greatly increased ratio of fuel and air going into the cylinders. It could also over-speed the turbo and cause erosion of the turbine blades on the exhaust side. Increasing the torque sent through the drivetrain can cause serious trouble, too. Transmission, driveshaft and rear axle manufacturers design their products to precisely match the level of torque they are specified for.

90. Sanders did not disclose the flashing of the ECMs nor is it discoverable in inspecting the vehicles. Creditors only discovered the alteration after a driver had disclosed it to Brooks.

91. Sanders and a former driver have admitted that URR and Sanders did not properly maintain the vehicles as represented in the Agreement.

92. Since closing, Creditors incurred significant maintenance expenses related to the tow trucks. In the first ten months since closing, First Recovery had spent $70,346.80 in maintenance for the upkeep of the trucks for a projected annual maintenance expense of $84,416. This amount is significantly above the annual maintenance expenses of $50,268 shown in 2014 Report.

93. Since closing, four of the six trucks have become inoperable, placing further financial stress on the business. None of the trucks would have passed a proper inspection at closing.

94.     Sanders also represented that the trucks had been properly inspected in accordance with 49 CFR Part 396. Sanders represented that he was a qualified inspector that Brooks could perform his own inspections moving forward.

95.     Sanders provided vehicle inspection certification form for all of the trucks he conveyed in the transaction. Each of the certifications shows that Sanders signed as the "inspector."

96.     According to the inspection certifications, Sanders performed inspections on all six trucks on August 5, 2015. These inspection certifications completed by Sanders were then submitted to the North Carolina Department of Transportation.

97.     On that same day, Sanders falsely represented he had conducted the inspections and had the requisite credentials to perform the duties as an inspector under 49 C.F.R. 396.19.

## FRAUD COMMITTED BY SANDERS

98.     The allegations contained in Paragraphs 1 through 97 are incorporated herein by reference as if fully set forth.

99.     On or about October 6, 2014, Sanders provided  Brooks with the 2014 Report. Like the 2010 Report Sunbelt provided to the Crafts, this report had a number of false and fraudulent misrepresentations:

   a. Repossession & Resale was established in February of 2000.

   b. They were ranked second in the state of NC for number of repossessions per year by their valued financial institutions.

   c. The first four major clients are the largest banks in the country

   d. 2 Office Employees a Billing Specialist paid $11 per hour and Update Specialist paid $10.00 per hour. 1 Marketing/Transportation Specialist paid $12 per hour.

e.  URR could transfer and assign its clients to First Recovery.

f.  URR could transfer and assign its bond to First Recovery.

g.  The trucks conveyed were in good working order and had been inspected as required by federal law.

100.    Again through Sunbelt, in October 2014 Sanders provided spreadsheets and balance sheets that fraudulently represented the finances of the company.

101.    Sanders provided the 2014 Report and spreadsheets with the intention of deceiving Creditors to enter in the Agreement.

102.    URR's top four clients in 2014 (PAR, Wells Fargo, American Recovery and Remarketing Solutions) are not the largest banks in the United States, and, upon information and belief, URR was not the second largest repossession company in North Carolina.

103.    Sanders had a duty to report changes in the business to the Creditors under the Agreement.

104.    In Spring 2015, Sanders failed to inform Creditors of the present status of contracts with PAR, Wells Fargo, Everest and Santander and potential claims by Everest and Santander.

105.    In Spring 2015, Sanders failed to inform Creditors that URR could not pay bills as they became due.

106.    In Spring 2015, Sanders failed to transfer client contracts, leases and the $1,000,000 client protection bond to Creditors.

107.    In April 2015, Sanders provided Creditors with a Form 1120 Tax Form that contained inflated and false income of $1,455,083.

108.    Sanders provided the above statements, emails and representations that were material to Creditors' decision to purchase the business.

109.    Sanders omissions of key information under which he had a duty to communicate were also material to Creditor's decision to purchase the business and close the transaction.

110.    Sanders provided the above statements, emails and representations with the intent to deceive Creditors.

111.    Sanders omissions of critical information also were committed with intent to deceive Creditors.

112.    Creditors reasonably relied on Sanders' representations. Creditors further relied that Sanders would not fail to disclose information.

113.    Sanders has obtained over $1,300,000.000 cash based on his fraud.

114.    Based on Creditors' reasonable reliance of material representations, which is acknowledged by Sanders in the Agreement, Sanders actions damaged Creditors in an amount in excess of $1,300,000.00.

115.    The debt owed to First Recovery and Brooks is exempted from discharge under 11 U.S.C. §§ 523 for the following reasons:

    a.  False Pretenses, False Representations or Actual Fraud § 523(a)(2)

    b.  Fraud, Defalcation, Embezzlement or Larceny § 523(a)(4)

WHEREFORE, the Creditors First Recovery, LLC, and Dylan Brooks respectfully demand the following relief:

1.    The Court enter judgment against Debtor for at least $1,300,000, plus any additional interest, costs and attorney's fees, if applicable;

2.      That such judgment be declared nondischargeable;

3.      The costs of this action be taxed to Debtor; and

4.      The Court grant such other and further relief as the Court may deem just and proper.

This the 13th day of January, 2020.

/s/John S. Austin
John S. Austin, Esq.
NCSB 20826
Austin Law Firm, PLLC
Attorney for Creditors
P.O. Box 30
Raleigh, NC 27602-0030
(919) 278-7634
Fax (919) 424-7007
john@johnaustinlaw.com

## CERTIFICATE OF SERVICE

I, John S. Austin, attorney for Creditors First Recovery, LLC and Dylan Brooks certify that

I served the foregoing documents upon the following party(ies) via the courts electronic filing

system (CM/ECF):

Gregory B. Crampton
*(Chapter 7 Trustee)*

William F. Braziel, III
Janiver Law Firm, PLLC
311 East Edenton Street
Raleigh, NC 27601
*(Attorney for Debtor)*

By electronic service via cm/ecf,and,

Keith Douglas Sanders
P.O. Box 21068
Raleigh, NC 27619

This the 13th day of January, 2020.

/s/John S. Austin
John S. Austin, Esq.
NCSB 20826
Austin Law Firm, PLLC
Attorney for Creditor
P.O. Box 30
Raleigh, NC 27602-0030
(919) 278-7634
Fax (919) 424-7007
john@johnaustinlaw.com