**SO ORDERED.**

**SIGNED this 31 day of August, 2023.**



_____

**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **KEITH DOUGLAS SANDERS,** | ) | **Case No.: 19-03665-5-JNC** |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| | ) | |
| **FIRST RECOVERY, LLC, and DYLAN BROOKS,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Adv. Pro. No. 20-00018-5-JNC** |
| v. | ) | |
| | ) | |
| **KEITH DOUGLAS SANDERS,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION WITH
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This matter is before the court on remand from the United States District Court for the

Eastern District of North Carolina. By Order (Dkt. 97) and Judgment (Dkt. 98) (collectively, the

"District Court Order") entered January 9, 2023, the District Court vacated the findings and

judgment made in the Order Granting Rule 7052 Motion (Dkt. 77; the "Vacated Order") issued

December 17, 2021, and remanded the case for a new trial. The Vacated Order entered judgment

1

on partial findings pursuant to Federal Rule of Bankruptcy Procedure 7052 for the defendant, Keith Douglas Sanders ("Debtor" or "Defendant"), holding the plaintiffs, First Recovery, LLC, and Dylan Brooks ("First Recovery" or "Mr. Brooks" and collectively, "Plaintiffs"), failed to establish a prima facie case of nondischargeability under §§ 523(a)(2)(A) or (B).

A new trial was conducted on July 13, 2023, in Greenville, North Carolina, following which the parties were granted the opportunity to file post-trial briefs. Based on the evidence presented at trial, the briefs submitted by the parties, and other pertinent portions of the record in the case, the court concludes Plaintiffs have proven, by a preponderance of the evidence, that the particular debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[1]

## JURISDICTION

The court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and holds authority to hear the matters pursuant to the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. The request for a determination as to the nondischargeability of particular debts is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). As such, in addition to consent, this court has jurisdiction to enter final orders and judgments in this matter. 28 U.S.C. § 157(b)(1). (*See* Final Pretrial Order of July 12, 2023, Dkt. 126).

## PROCEDURAL HISTORY

Debtor filed his voluntary petition under chapter 7 of the United States Bankruptcy Code on August 9, 2019. In Schedule E/F, he listed an unsecured but disputed claim for First Recovery in the amount of $1,300,000.00. (BK Dkt. 13.) This adversary proceeding was initiated by Plaintiffs filing a complaint (Dkt. 1; the "Complaint") on January 13, 2020, alleging Debtor

---

[1] Based on remand instructions, the court also analyzed and finds Plaintiffs did not satisfy their burden under § 523(a)(2)(B) as discussed below. Thus, the non-discharge ruling is limited to § 523(a)(2)(A).

engaged in a series of acts involving fraudulent representations relating to the sale of his prepetition automobile, asset recovery, and repossession business to Plaintiffs. The Complaint sought an exception to discharge determination regarding the $1,300,000 claim (the "Debt") pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B), and (a)(4). Debtor filed a Motion to Dismiss Pursuant to Bankruptcy Rule 12(b)(6) and to Strike Allegations Pursuant to Bankruptcy Rule 12(f)(2) on March 19, 2020 (Dkt. 8). Plaintiffs responded (Dkt. 13) by withdrawing the § 523(a)(4) claim, which resolved the Motion to Dismiss, and opposing the Motion to Strike. The court denied the Motion to Strike (Dkt. 17) on May 29, 2020. Debtor amended his answer to respond to the balance of the allegations in the Complaint on July 10, 2020 (Dkt. 20).

The first trial of this matter took place over the course of four nonconsecutive days in August and October 2021. At the conclusion of Plaintiffs' presentation of evidence, Debtor made an oral motion pursuant to Federal Rule of Bankruptcy Procedure 7052(c) for a judgment on partial findings. Both parties subsequently submitted briefs. After review, the Vacated Order was entered on December 17, 2021, granting Debtor's Rule 7052 motion and entering judgment for him. Specifically, the Vacated Order found Plaintiffs failed to establish the reliance elements required under §§ 523(a)(2)(A) or (B).

Plaintiffs filed their Notice of Appeal (Dkt. 79) pursuant to 28 U.S.C. § 158(a) and Fed. R. Bankr. P. 8002 on December 28, 2021. On appeal, the United States District Court for the Eastern District of North Carolina held that the bankruptcy court incorrectly applied the reasonable reliance standard to subsection (A) rather than the justifiable reliance standard, and that additional fact finding was needed on the reliance determination as to subsection (B). It vacated and remanded the matter for new trial with the following instructions:

> The bankruptcy court's order rested almost exclusively upon the reliance element under both subsections, and thus the court largely did not make findings regarding

3

the remaining elements under 11 U.S.C. § 523(a). With the bankruptcy court's findings of a lack of reasonable and justifiable reliance vacated, on remand the bankruptcy court shall also make determinations regarding the remaining elements of nondischargeability pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B). Given the need for additional findings of fact as to all elements of nondischargeability, as well as the retirement of the bankruptcy judge who oversaw the prior bench trial, the court remands for a new trial.

*First Recovery, LLC v. Sanders*, 2023 U.S. Dist. LEXIS 5007, *5, 5:21-CV-530-FL at 15 (E.D.N.C. Jan. 9, 2023).

The new trial was conducted in Greenville, North Carolina, on July 13, 2023.[2] John S. Austin appeared for Plaintiffs, and William E. Brewer, Jr. and William F. Braziel, III, appeared for Debtor. On August 3, 2023, Plaintiffs and Debtor submitted respective post-trial briefs (Dkts. 135 and 136). This matter is now ripe for determination. The court accordingly makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

## **FINDINGS OF FACT**

1.      In 2004, Debtor formed Unlimited Recovery, LLC, to perform automobile recovery, towing and repossession services. (Trial Tr. at 86, August 18, 2021, Dkt. 95.)

2.      Subsequently, in 2010, Debtor sold the towing side of the business and created Unlimited Recovery Repossession Division, LLC ("URRD" or the "Company"), mainly performing repossession services. (Trial Tr. at 86-87, August 18, 2021, Dkt. 95.)

---

[2] As noted in the Final Pretrial Order (Dkt. 126) of July 12, 2023, the parties agreed and stipulated:

The testimony and documents offered and admitted into evidence in the previous trial in this matter as recorded and documented in the trial transcripts is hereby received into evidence without plaintiff or defendant being required to offer the previous testimony or exhibits once again. Consequently, and at the request and upon agreement of the parties, it is ORDERED that the retrial of this matter beginning July 13, 2023, open at the end of plaintiff's presentation in the first trial with plaintiff afforded an opportunity for presentation of new or further testimony and other evidence. Alternatively, plaintiff may rest on the existing record. [Debtor] shall then be permitted the opportunity to offer further testimony and other evidence, or alternatively rest on the existing trial record as well.

3.      In late 2011, Debtor sold URRD to Jordan and Linda Craft (the "Crafts" and the "Craft Sale"). (Trial Audio at 2:15, July 13, 2023, Dkt. 129.). Regarding that prior sale:

a.      During the due diligence period of the Craft Sale, the Crafts reviewed URRD's tax returns from 2008, 2009, and 2010, as well as 2011 profit and loss statements before opting to purchase URRD for approximately $1.2 million that same year. (Trial Audio at 3:55-4:10, and 22:38-22:41, July 13, 2023, Dkt. 129.)

b.      During the Craft Sale negotiation period, Debtor did not provide access to bank statements or the Recovery Database Network ("RDN"), a central, all-inclusive database storing customer and revenue reports on vehicle repossessions. (Trial Audio at 42:40-43:10, July 13, 2023, Dkt. 129; Trial Tr. at 44, August 17, 2021, Dkt. 84; Trial Tr. at 6-7, October 20, 2021, Dkt. 87.) The Craft's lending institution required and prioritized the importance of tax returns as more reliable than other financials. (Trial Audio at 42:40-43:10, July 13, 2023, Dkt. 129.)

c.      Following the Craft Sale, once the Crafts had access to the RDN reports and bank statements, the Crafts discovered the repossession numbers and revenues were significantly less than had been represented to them during the sale.  (Trial Audio at 5:50-6:00 and 42:15-42:40, July 13, 2023, Dkt. 129.)

d.      Post-closing, they also discovered URRD's revenue stream and other financials were inflated due to the towing portion of the business sold in 2010, as well as substantial revenue from buying and reselling vehicles, which items were not disclosed as a substantial part of the business during the pre-closing period. (Trial Audio at 11:10-12:00 and 40:00-45:40, July 13, 2023, Dkt. 129.)

e.      Debtor also represented that URRD's lot leases, customer contracts, and the allied bond—required in operating a repossession business—could be assigned allowing the Crafts

5

to continue business operations without delay. (Trial Audio at 17:10-17:30, July 13, 2023, Dkt. 129.) However, post-closing, the Crafts discovered the bond, lot leases, and customer contracts were not unilaterally assignable by Debtor. (Trial Audio at 18:37-19:36, July 13, 2023, Dkt. 129.)

    f.  Based on these deficiencies, the Crafts were unable to continue normal course operations seamlessly upon taking ownership and control of URRD. After filing a lawsuit, the Crafts and Debtor agreed pursuant to a settlement agreement to "unwind" the Craft Sale; the Crafts would be reimbursed Debtor would reassume control, liabilities, and ownership of URRD. (Trial Tr. at 98, August 18, 2021, Dkt. 95; Trial Audio at 20:35-22:00, July 13, 2023, Dkt. 129.)

  4.  After re-acquiring URRD, in March of 2013 Debtor contacted Jim Martinez, the Sunbelt broker who worked with Debtor on the Craft Sale, about re-listing URRD for sale. (Trial Tr. at 17-18, August 17, 2021, Dkt. 84.)

  5.  Around this time, Mr. Brooks was seeking to invest in a new business venture. He is an experienced businessman, holding a degree in economics with a concentration in finance and strategic management from the Wharton School of Business at the University of Pennsylvania. Prior to purchasing URRD, he had owned and operated multiple convenience stores and cell phone stores but had no prior knowledge or experience operating a repossession business. (Trial Tr. at 16-17, August 17, 2021, Dkt. 84.)

  6.  On October 7, 2014, after reviewing the Sunbelt listing, Mr. Brooks reached out to Mr. Martinez for more information about the business and received a reply email containing URRD information including: a business summary report ("BSR"), financial spreadsheets, and an asset list (collectively, the "BSR Packet"). (Trial Tr. at 18, August 17, 2021, Dkt. 84; *see also* Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.)

7.    The BSR states URRD is a "Repossession and Resale" business providing services specified as "repossess[ing] vehicles, boats, airplanes, and equipment for banks, credit unions, private lenders and others in the finance industry. They also handle resales on the repossessions for some of their clients." (Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.) It contained the following disclaimer: "The information is provided only as an introduction to the business. The buyer must ultimately complete their own due diligence to determine whether or not to invest in the business." (Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123; *see also* Trial Tr. at 34-35, August 18, 2021, Dkt. 95.)

8.    Pre-closing, in addition to the BSR Packet, Mr. Brooks reviewed URRD's 2009 through 2013 tax returns and various profit and loss statements. (Trial Tr. at 29 and 47, August 17, 2021, Dkt. 84.) Mr. Brooks was denied access to the RDN, all QuickBooks files, and bank records pre-closing. (Trial Tr. at 48-49 and 113-14, August 17, 2021, Dkt. 84.)

9.    During negotiations, Debtor made written (including the BSR Packet) and repeated oral representations to Plaintiffs regarding URRD, including representations and omissions about: (1) the assignability of the bond, client contracts, and leases; (2) the experience of the drivers and hours needed to oversee operations; (3) condition and inspection of vehicles; (4) the unraveling of the prior "Craft Sale;" (5) representations made in the BSR; and (6) representations regarding revenues. Specifically, the BSR Packet and Debtor represented:

a.    The required bond as being transferrable, assignable, and a value to the business. (Trial Tr. at 23-24, August 17, 2021, Dkt. 84.) Assignability was important because, as the BSR stated, the bond takes several years to obtain and requires vigorous training, background checks, and financial stability. (Trial Tr. at 25, August 17, 2021, Dkt. 84; Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.)

7

     b.     URRD's customer contracts and leases as being assignable as part of the asset purchase agreement assuming certain requirements are maintained including: a credit score of 720, U.S. citizenship, financial stability, good driving record, etc. (Trial Tr. at 69 and 84, August 17, 2021, Dkt. 84; Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.) It is uncontested that Plaintiffs met these threshold requirements. (Trial Tr. at 26, August 17, 2021, Dkt. 84.)

     c.     URRD employed thirteen employees, including six repossession agents, four lot attendants, and office staff,  and "[t]he owner oversees the business and only fills in [during] a[n] emergency." (Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.) Debtor represented that he spent between fifteen to thirty hours per week overseeing the business. (Trial Tr. at 28, August 17, 2021, Dkt. 84.)

     d.     URRD ranked second in North Carolina business for number of vehicle repossessions. (Trial Tr. at 24-25, August 17, 2021, Dkt. 84; Dkt. 123; Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.)

     e.     URRD's four major clients were among the largest banks in the country. (Trial Tr. at 25, August 17, 2021, Dkt. 84; Pls.' Ex. 7, Sunbelt 2014 Business Summary Report, Dkt. 123.) Around the same time, an email provided those customers were Wells Fargo, Wachovia, PAR North America, and Remarketing Solutions. (Pls.' Ex. 12, Top Accounts Email, Dkt. 123.)

     10.     Pursuant to Mr. Brooks' offer to purchase, satisfaction of certain contingencies were required, such as: "Satisfactory inspection of all equipment and assets of the business which convey with the sale." (Pls.' Ex. 27, Offer to Purchase 2014, Dkt. 123.) Mr. Brooks relied upon Debtor's representations the vehicles being transferred had been properly inspected, licensed, and maintained; however, after closing, discovered Debtor, lacking authority to do so, had personally performed the required inspections. (Trial Tr. at 45, August 17, 2021, Dkt. 84.)

11.    In reviewing URRD's financials from 2011 to 2012, Mr. Brooks raised concerns over the "disruption" resulting from the Craft Sale showing decreased financials. (Trial Tr. at 30, August 17, 2021, Dkt. 84.) Specifically:

a.    In an email chain between Debtor, Mr. Brooks, and their respective attorneys John-Paul Schick and Doug McClanahan on June 29 and 30, 2015, Mr. McClanahan mentioned the Crafts by name and inquired for information beyond that provided on the North Carolina Secretary of State's website. (Pls.' Ex. 14, Why Owner Failed Email, Dkt. 123.)

b.    In both email and oral representations, Debtor, or his agent, represented that the Crafts had purchased URRD, proceeding to "run the business into the ground" and "couldn't get the required bond, so they defaulted on their loan and their bank took the business." Subsequently, Debtor "bought it back from the bank". . . "out of his goodness and kindheartedness." (Trial Tr. at 32, August 17, 2021, Dkt. 84; Trial Tr. at 82, August 18, 2021, Dkt. 95; Pls.' Ex. 14, Why Owner Failed Email, Dkt. 123.)

c.    Pre-closing, neither Debtor nor his agents disclosed the lawsuit arising from the Craft Sale. (Trial Tr. at 33, August 17, 2021, Dkt. 84.)  Post-closing, he discovered the lawsuit involving the Crafts and Debtor regarding the Craft Sale, prompting a deeper investigation into the validity of the pre-sale representations made by Debtor. (Trial Tr. at 53, August 17, 2021, Dkt. 84.)  Mr. Brooks maintains that had a civil action check been performed and a copy of the lawsuit provided, the sale at issue would not have closed. (Trial Tr. at 42-43, August 18, 2021, Dkt. 95.) However, Mr. Brooks was satisfied by the explanation provided regarding the Craft Sale, believing that the Crafts had "mismanaged" and "botched the whole thing when they tried to take the business over." (Trial Tr. at 82, August 18, 2021, Dkt. 95.)

12.     Also pre-closing, Mr. Brooks became aware of certain unpaid payroll taxes in the amount of approximately $350,000 arising at the time the towing portion was sold in 2010 through Debtor's subsequent creation and operation of URRD resulting in a federal tax lien encumbering URRD's assets. (Trial Tr. at 9-15, August 18, 2021, Dkt. 95.) Debtor represented the outstanding payroll taxes were due to the sale of the towing portion in 2010 and URRD was not responsible for any deficiency. (Trial Tr. at 13-15, August 18, 2021, Dkt. 95; Trial Tr. at 62-64, October 19, 2021, Dkt. 86.) Upon Plaintiffs' purchase of URRD, the tax lien was satisfied by sale proceeds. (Trial Tr. at 63-64, October 19, 2021, Dkt. 86.)  He further testified that the "oversight" regarding outstanding payroll taxes and tax lien was not concerning based on Debtor's explanation and satisfaction of the lien at sale in 2015. (Trial Tr. at 9-15, August 18, 2021, Dkt. 95.)

13.     In reviewing URRD's listing with Sunbelt, Mr. Brooks focused on the represented revenue, cash flow, longevity of the Company, state-wide customer coverage, ranking second in North Carolina for annual number of repossessions, URRD's four major clients being the largest banks in the country, and other representations in the BSR Packet attracting him to inquire further about the Company. (Trial Tr. at 20-22, August 17, 2021, Dkt. 84.)

14.     URRD's revenue numbers from tax returns showed: $1,362,840 in 2009; $1,413,878 in 2010; $1,225,789 for the first 10 months in 2011; $421,242 for 4 months in 2012; $1,315,724 in 2013; and $1,455,083 in 2014. (Trial Tr. at 30, August 17, 2021, Dkt. 84.) However, according to the RDN, URRD's revenues were: $359,433 in 2009; $766,031 in 2010; $583,984 for the first 10 months in 2011; $252,640 for 4 months in 2012; $1,072,171.76 in 2013; and $1,263,415 in 2014. (Trial Tr. at 56-57, August 17, 2021, Dkt. 84.) These latter  figures are significantly different from the tax return revenue figures represented to Mr. Brooks pre-closing,

with some years showing half or less than half revenue than represented. (Trial Tr. at 54-57, August 17, 2021, Dkt. 84.)

15.     Post-closing, Mr. Brooks discovered that Debtor had made these numerous material omissions and misrepresentations regarding URRD, including the assignability of customer contracts, lot leases, and the bond; hours required to oversee and manage the Company; condition and state of inspection of assets of vehicles; reported revenue discrepancies; and actual reasons for the Craft Sale unraveling. (Trial Tr. at 57, 62-63, 72-73, 84, and 97, August 17, 2021, Dkt. 84.) His testimony establishes that Plaintiffs reviewed the provided documents and relied on the assertions before deciding to purchase URRD for a price of $1.3 million, which closed on July 31, 2015. (Trial Tr. at 40 and 46, August 17, 2021, Dkt. 84.)

16.     Mr. Brooks discovered the significant discrepancy between the revenues contained in the BSR Packet and tax returns compared to the revenues found in the RDN reports after closing. (Trial Tr. at 56-62, August 17, 2021, Dkt. 84.) He determined that the RDN only contained revenues from repossessions, not the re-sale of the vehicles and other assets, while the tax returns contained significant sums of money from sources beyond the repossession services provided by URRD that he purchased. (Trial Tr. at 31, August 18, 2021, Dkt. 95.)

17.     Pre-closing, URRD borrowed under both business and factoring loans from Everest and Fundbox, and Debtor took out personal loans, none of which were disclosed to Mr. Brooks. (Trial Tr. at 68, 113-14, and 138-41, August 18, 2021, Dkt. 95.) These loans funded cash infusions into URRD in the months prior to closing, thereby inflating revenue viability in the financials for the pre-purchase period. (Trial Tr. at 152-56, October 19, 2021, Dkt. 86.)

18.      Mr. Brooks discovered post-closing that the bond, land leases, and certain contracts could not be unilaterally transferred or assigned as Debtor had represented. (Trial Tr. at 97, August

17, 2021, Dkt. 84; Trial Tr. at 150, August 18, 2021, Dkt. 95.) In fact, at least one customer contract was cancelled due to an attempted assignment violating its non-assignability clause. (Trial Tr. at 97, August 17, 2021, Dkt. 84.) In his testimony, Debtor admitted he did not know whether the customer contracts were assignable despite his pre-closing representations of assignability. (Trial Tr. At 179, August 18, 2021, Dkt. 95.)

19.     Kevin Hodsdon, a former employee of Debtor from 2008 through 2011, who has at least ten years' experience in the repossession and towing business, testified that during his time at URRD after the towing portion of the business was sold, Debtor had a "running joke" the repossession business could never be sold because the client contracts were not transferrable. (Trial Tr. At 5-7 and 15, October 20, 2021, Dkt. 87.)

20.     Mr. Brooks discovered post-closing that, in addition to the employees Debtor disclosed pre-closing and Debtor's hours spent overseeing URRD's operations, Leah Brougham, URRD Office Manager, was a full-time employee working approximately forty hours per week overseeing the business and making over $60,000 annually. (Trial Tr. At 70, October 19, 2021, Dkt. 86; Trial Tr. At 92-93, August 17, 2021, Dkt. 84; Trial Tr. At 179, August 18, 2021, Dkt. 95.)

21.     Debtor filed his voluntary petition under chapter 7 of the Bankruptcy Code on August 9, 2019, and listed the subject debt in it as disputed.  On January 13, 2020, Plaintiffs timely commenced this Adversary Proceeding.

## ANALYSIS

The general discharge of debts in chapter 7, as codified in 11 U.S.C. § 727,  is subject to the sixteen categories of nondischargeable debt exceptions listed in section 523(a). Two such exceptions concern "debts traceable to falsity or fraud or to a materially false financial statement, as set out in § 523(a)(2)[.]" *Field v. Mans*, 516 U.S. 59, 64 (1995).

Title 11 U.S.C. § 523(a)(2) provides in relevant part:

(a) A discharge under section 727 … of this title does not discharge an individual debtor from any debt—
…
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive….

11 U.S.C. § 523(a)(2)(A)-(B).

Debtors are therefore prohibited from "discharging debts for money … obtained by 'false pretenses, a false representation, or actual fraud,' 11 U.S.C. § 523(a)(2)(A), or, if made in writing, by a materially false 'statement . . . respecting the debtor's . . . financial condition,' § 523(a)(2)(B)." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1758 (2018). The creditor bears the burden of establishing the exception to discharge under either section by a preponderance of the evidence. *First Recovery*, 2023 U.S. Dist. LEXIS 5007 at *5 (citing *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994)). "When addressing exceptions to discharge, we traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start…." *Foley & Lardner v. Biondo*, 180 F.3d 126, 130 (4th Cir. 1999) (citation omitted). Nevertheless, courts "are equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Id.* (citation omitted).

To find a particular debt as non-dischargeable, its existence must first be established. Without a debt, the question of its discharge is irrelevant. *In re Campbell*, 545 B.R. 875, 885-86 (Bankr. M.D.N.C. 2016). Plaintiffs purchased URRD from Debtor on July 31, 2015, in the amount

13

of $1,300,000.[3] They assert Debtor made multiple fraudulent misrepresentations in the sale of URRD resulting in the Debt and Plaintiffs receiving a materially different business than the one represented pre-closing. Consequently, Plaintiffs seek a nondischargeability determination for the Debt pursuant to subsections (A) and (B).

"It is well established that these subsections are mutually exclusive." *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 605 (9th Cir. 1998) (citing H.R.Rep. No. 95-595, at 549 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6453). Subsection (A) expressly carves out false representations regarding a debtor's financial condition and is not limited to written representations but equally applies to oral representations as well. Whereas subsection (B) in contrast, "expressly deals with fraudulent misrepresentations respecting a debtor's financial condition[,]" which are required to be in writing. *Barrack*, 217 B.R. at 605. Further, while subsection (B) imposes a heightened "reasonable" reliance, courts have consistently held that subsection (A) requires only proof of the less burdensome common law "justifiable" reliance standard. 11 U.S.C. § 523(a)(2)(B)(iii); *Field*, 516 U.S. at 68.

Based on these distinct and mutually exclusive differences, the initial inquiry is whether Debtor made a representation respecting his or an insider's financial condition.  For subsection (A), "[A] statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. *First Recovery*, 2023 U.S. Dist. LEXIS 5007, at *7 (quoting *Appling*, 138 S. Ct. at 1761). "A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.*  However, *Appling* should not be read so broadly as to include a finding on

---

[3] No testimony or other evidence was presented by Debtor at either trial disputing the URRD sale price of the amount of damages claimed by Plaintiffs .

whether "every statement about the value and character of a single asset is made 'respecting the debtor's or an insider's financial condition.'" *Id.* at *8 (citing 11 U.S.C. § 523(a)(2)(B) (emphasis in original).

In the present case, regarding the subsection (A) claim, the court must review the effect of the Debtor's nonfinancial statement and oral misrepresentations and omissions regarding the ability to assign URRD lot leases, customer contracts, and bond at closing; the unraveling of the Craft Sale; URRD's drivers' experience and abilities; the condition of URRD's vehicle and Debtor's credentials to inspect them; sources of income; and historical active management and oversight hours. Conversely, Debtor's written representations made in the BSR Packet concerning URRD's revenue such as the tax returns must be analyzed pursuant to subsection (B) where these items were made "respecting the debtor's or an insider's financial condition."

### 1. Representations and Omissions under Subsection (A)

Under subsection (A), a plaintiff must prove the elements of common law fraud, which are: a "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." *Rountree v. Nunnery*, 478 F.3d 215, 218 (4th Cir. 2007). The District Court Order specifically noted the following representations and/or omissions made by Debtor must be analyzed:

1. Representations regarding the assignability of the bond;
2. Representations regarding the assignability of the client contracts;
3. Representations regarding the assignability of the leases;
4. Representations regarding the experience of the drivers;
5. Representations regarding the hours needed to oversee the Company's operations;
6. Representations and omissions regarding the prior purchasers, Jordan and Linda Craft;
7. Representations regarding condition of vehicles and  credentials to inspect them.

*First Recovery*, 2023 U.S. Dist. LEXIS 5007 at *12.

### a. **False Representations**

Debtor made multiple materially false representations and omissions in obtaining money from the Plaintiffs on the sale of his business. In the course of negotiations, he actively told Plaintiffs the required bond, client contracts, and lot leases were assignable, transferrable, and valuable under the asset sale agreement. These representations were false as, according to the terms of each, neither the bond, contracts, nor leases were assignable. In fact, Plaintiffs were never able to obtain the required bond through assignment or otherwise based on the rigorous requirements for bond qualification demanding threshold experience and reputation levels within the industry. Post-closing, instead of assigning the bond from URRD to First Recovery, as contemplated, Debtor attempted to substitute Mr. Brooks' name onto the bond under URRD. Meanwhile, a major bank client cancelled its contracts with URRD upon learning of an attempted assignment.

Debtor also falsely represented, upon Plaintiffs' inquiry, that the Crafts proceeded to "run the business into the ground" because they "couldn't get the required bond, so they defaulted on their loan and their bank took the business." Debtor falsely stated that he had "bought it back from the bank" … "out of his goodness and kindheartedness." Post-closing, Debtor discovered this explanation was patently untrue, self-serving and false. The Crafts had initiated a lawsuit against Debtor alleging the Craft Sale was ripe with fraud and sought remedial measures. To settle that case, Debtor reimbursed and reassumed control of URRD directly from the Crafts. Debtor omitted disclosing the Craft Sale, and when later asked made materially false representations regarding the same and further omissions as to the subsequent lawsuit. The failure to inform Plaintiffs of the true facts materially affected this second sale of the business.

Debtor made additional false representations regarding his average hours worked weekly overseeing URRD, the state of its vehicles, the experience of its drivers, and vehicle inspections.

He represented to Mr. Brooks, pre-closing, that he spent approximately fifteen to thirty hours per week overseeing URRD's services and "only fills in [during] a[n] emergency." Debtor failed to disclose, on the BSR or otherwise his office manager, Leah Brougham, worked full time making $60,000 annually. Debtor purported to have performed the inspection checks on URRD vehicles. However, shortly after assuming ownership and control of the Company, Mr. Brooks was forced to incur $77,000.00 of vehicle mechanical bills. This omission led to Mr. Brooks being forced to spend significant additional time and money post-closing to keep the business afloat. As a result, after taking over URRD, Plaintiffs realized the business as represented was not sustainable and could not be continued along its prior course.

**b.  <u>Knowledge</u>**

Based on Debtor's prior transaction with the Crafts resulting in the Craft Sale being unwound, Debtor knew these pre-closing representations were patently false.  He knew the bond, an essential requirement in operating a repossession business, was not assignable. The same applies to the customer contracts and lot leases. Following Debtor's reimbursement and reassuming control of URRD, he was attuned to the reasons the Craft Sale failed. Mainly, within weeks of taking over the business, they realized in short order that the business represented and sold was not there, and they could not conduct business in normal course. Additionally, Debtor had previously made jokes to at least one URRD employee regarding his inability to sell the repossession business due to the non-assignability of URRD's contracts and bond.

Based on the Craft Sale fiasco, Debtor without question knew that any subsequent sale of URRD came with an inability to assign important Company contracts, leases, and the bond. Conversely, if Debtor convinced himself that non-assignable assets could be assigned, a factual

representation made with inadequate knowledge can constitute a false representation. *See Kovens v. Goodwich (In re Goodwich)*, 517 B.R. 572, 589 (Bankr. D. Md. 2014).

Finally, Debtor's actions just prior to closing constituted a concerted attempt to keep URRD afloat under a guise of normal operations, underscoring his knowledge that the Company was not performing as represented. Debtor made capital contributions from personal and business loans undisclosed to Plaintiffs, sold assets that were reported as cash flow, and deliberately underpaid taxes. These cash infusions and failures to pay made the business appear to be operating normally based on the pre-closing information. Post-closing, however, Plaintiffs, similar to the Crafts years before, promptly realized the business they were sold was not as advertised. The court can only conclude Debtor had the requisite knowledge that his representations and material omissions were false and misleading.

### c.  **Intent**

The court may infer a debtor's intent from surrounding facts and circumstances. *Select Bank & Tr. Co. v. Crawford (In re Crawford)*, 2022 Bankr. LEXIS 1368, *22 (Bankr. E.D.N.C. May 12, 2022) (citing *In re Lamanna*, 2012 Bankr. LEXIS 1102, *8 (Bankr. E.D.N.C. Mar. 15, 2012). "[A] debtor will be found to have acted with the requisite intent to defraud under § 523(a)(2)(A) when, at the time the transaction occurred, it is established that the debtor, for [] personal gain, knowingly mislead [sic] the investor as to a material fact concerning the [debt]." *Ramirez-Lopez v. Cox (In re Cox)*, 2012 Bankr. LEXIS 5854, at *10-11 (Bankr. E.D.N.C. Dec. 21, 2012) (quoting *Wilson v. Wall-McMahel (In re Wall-McMahel)*, No. 09-00231-8-JRL, 2010 Bankr. LEXIS 3290, *18 (Bankr. E.D.N.C. Sept. 16, 2010). Assignability of the bond was valuable to the business and required for continued and uninterrupted operations. As a pivotal asset of the Company, bond assignability materially affected the overall value of the business.  Bond non-

18

transferability directly impacted post-sale non-profitability. Similarly, the inability to assign customer contracts negatively affected post-sale operations. Based on the knowing omissions, the material misrepresentations and the knowledge attributed to Debtor, intent is inferred. He held the requisite intent to mislead plaintiffs in order to gain $1.3 million by selling URRD.

### d.  Justifiable Reliance

Justifiable reliance need not "conform to the standard of the reasonable man." *Field*, 516 U.S. at 70-71. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71. "[A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Id.* at 70. And "justifiable reliance" is described as:

> [T]he illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage.

*Biondo*, 180 F.3d at 135, (quoting *Field*, 516 U.S. at 70, citing Restatement (Second) of Torts § 540, Illustration 1 (1977)).

While justifiable reliance does not normally give rise to a duty to investigate, "a duty to investigate can arise when the surrounding circumstances give rise to red flags that merit further investigation." *In re Sharp*, 340 F. App'x 899, 907 (4th Cir. 2009). "A person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field*, 516 U.S. at 71. "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered

something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id.*

Mr. Brooks, coming into the present transaction with a business degree and having owned multiple other businesses, identified the revenue shortfalls or "red flags" in 2011 and 2012 attributable to the Craft Sale without knowing the same. His attorney performed a North Carolina Secretary of State entity search discovering the Crafts owned the business for a short period and began investigating those circumstances. In response to the inquiries and concerns about the Craft Sale, Debtor, and his agents, knowingly made additional false representation, assuring Mr. Brooks that the failure of the prior sale was attributable solely to the Crafts having "proceeded to run [the business] into the ground," and when they "couldn't get the required bond . . . they defaulted on their loan and their bank took the business." Debtor told Mr. Brooks that he had "bought it back from the bank" out of his "goodness and kindheartedness."

Relying on these false representations as the circumstances for the Craft Sale was justifiable without raising more red flags, which had been resolved by Debtor's explanation. In addition, Plaintiffs did not blindly rely on the representations as his due diligence investigation and inquiry continued.  In the present case, although Mr. Brooks had not purchased a repossession business before, he was familiar with purchasing, owning, and operating other businesses. In performing due diligence, he relied on the BSR Packet, which represented URRD as a "high cash flow business." Belief that an increase of future cash flow and margin was viable became the driving characteristic of the purchase. Plaintiffs' reliance on Debtor's factual misrepresentations pre-closing under the findings of fact in this case was therefore justifiable.

e.  **Causation**

Proximate cause is both (1) causation in fact, "loss suffered by one who justifiably relies upon the trust of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;" and (2) legal causation, "if the loss might reasonably be expected to occur from the reliance." *Hathaway v. OSB Mfg., Inc. (In re Hathaway)*, 364 B.R. 220, 237 (Bankr. E.D. Va. 2007) (quoting *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 622 (Bankr. E.D. Va. 2001) (citation omitted).

Debtor had owned URRD since 2004. He was comprehensively aware of the revenue stream attributable to actual vehicle repossessions, and the mischaracterization effect of revenue coming from vehicle "flips," plus amounts attributable to the public towing portion of the business sold in 2010. He knew of the circumstances surrounding the initial purchase and subsequent unwinding of the Craft Sale. Even assuming the validity of his contention that the Crafts "r[a]n the business into the ground," Debtor had knowledge of the Crafts' past allegations and assertions that the business —as represented and sold—was not present. And he repeated that history rather than fixing it, crucially while actively hiding that information from the Plaintiffs.

The Fourth Circuit *Biondo* decision is instructive. 180 F.3d 126. In it, the debtors entered into an agreement assigning distributions from real estate entities to satisfy a debt owed to a creditor. *Id.* at 129-30. However, contrary to their assignability representations, they had previously transferred away their interests leaving nothing to their creditor but an empty transfer agreement. *Id.* at 129. As here, the *Biondo* debtors misrepresented their capacity to assign an asset, which untruth was not discovered by creditor until later.

Here, based upon the testimony and other evidence of Debtor's strategic material omissions[4] and false representations as discussed above, Mr. Brooks was enticed by Debtor to purchase the business for $1.3 million that was materially overstated in value and was not the actual business sold. Debtor, through his fraudulent misrepresentations regarding URRD, proximately caused this sale facilitating the transfer to Plaintiffs. Mr. Brooks justifiably relied on the representations made by Debtor in facilitating URRD's sale. In transferring the URRD assets and accepting payment, Debtor completed the sale to Plaintiffs for $1.3 million satisfying the final element under subsection (A). Accordingly, Plaintiffs have established by a preponderance of the evidence that the Debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## 2. **Representations under Subsection (B)**

Subsection (B) provides an independent basis for nondischargeability of a particular debt upon proof: (1) that the debtor obtained money, (2) by use of a statement in writing, (3) with that statement being materially false, (4) with respect to the debtor's or an insider's financial condition, (5) upon which plaintiff reasonably relied, and (6) that the debtor caused the materially false financial statement to be published with the intention to deceive. 11 U.S.C.A. § 523(a)(2)(B); *see Sharp*, 340 F. App'x at 901. "Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance itself; and not only a representation but also one that is material; and not only one that is material but also one that is meant to deceive." *Field*, 516 U.S. at 68.

In this case, the representations properly analyzed under subsection (B) include representations regarding URRD's revenues contained in the BSR Packet and otherwise. As discussed above, the revenue representations were made in writing and concerning financial

---

[4] "An omission can constitute a representation for purposes of nondischargeability, especially if the circumstances create a false impression that the defendant is aware of." *Select Bank & Tr. Co.*, supra, at *21-22.

condition. Therefore, the elements required under subsection (B) must be satisfied for a separate or second ground for determination of nondischargeability.

### a. **Obtained Money**

At closing, Plaintiffs purchased URRD from Debtor for $1.3 million in exchange for the Company, its assets, goodwill, and other provisions contemplated in the asset purchase agreement and sale. Therefore, Debtor obtained money from this transaction establishing the Debt.

### b. **Writing**

Mr. Martinez, the Sunbelt broker representing Debtor and the sale of URRD, sent Mr. Brooks an email containing the BSR Packet with financials showing the revenue from 2009 to 2013. The BSR Packet contained information regarding URRD supplied by Debtor. Specifically, Plaintiffs obtained from Debtor, or his agent, URRD's tax returns and profit and loss statements covering the same time period, as well as disclosures and representations contained in the BSR.

### c. **Materially False**

Under § 523(a)(2)(B), "a statement is 'materially false' if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision." *In re Michael*, 263 B.R. 591, 598 (Bankr. W.D. Tenn. 2001) (citing *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)). Courts are guided by "whether the lender would have made the loan had he known of the debtor's true financial condition." *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir. 1995) (citing *Bogstad*, 779 F.2d at 375). The representations concerning URRD's financial condition was a material inducement for Plaintiffs to purchase URRD. The BSR was an initial document provided by Sunbelt at Debtor's instruction. Its sole purpose was for attracting potential customers to URRD's sale. Moreover, the revenue as depicted by the tax returns painted a "substantially untruthful picture" of Debtor's financial condition,

ultimately, affecting the creditor's decision purchasing the Company. *See Michael*, 263 B.R. at 598 (citing *Bogstad*, 779 F.2d at 375). Tax returns were the financials prioritized by Plaintiffs' lending institution. It was normal course for Mr. Brooks, in evaluating potential businesses for purchase, to review a business's cash flow representing one of the most important factors. In doing so, Mr. Brooks relied on the URRD tax returns and profit and loss statements showing strong cash flow. Additionally, the BSR represented "[t]his is a high cash flow business and will continue to grow at the pace a [sic] owner wants."

Based on Debtor's actions providing cash infusions propping URRD's financials, as well as the income attributable to vehicle sales, which were not represented to Plaintiffs as a substantial portion of URRD's business, the represented revenue created a substantially untruthful picture of URRD's financial condition pre-closing. Post-closing, Plaintiffs discovered after learning of the Craft lawsuit and investigating the RDN that the represented business was substantially not there. Revenue figures for some years were as little as half Debtor's pre-closing representations. Had Plaintiffs been aware of URRD's true financial condition picture pre-closing, Plaintiffs would not have continued discussions and closed the sale. Therefore, Debtor's representations regarding revenue were materially false as providing a substantially untruthful picture of Debtor's financial condition affecting Plaintiffs' decision to proceed with the purchase of URRD.

### d.  <u>Financial Condition</u>

"[A] statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. *First Recovery*, 2023 U.S. Dist. LEXIS 5007 at *7 (quoting *Appling*, 138 S. Ct. at 1761). The focus must be on whether a statement has a direct relation to and impact on a debtor's "'aggregate financial condition' such that it 'can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not.'" *Id.* at *8-9 (quoting

*Appling*, 138 S. Ct. at 1761 (holding a debtor's representation "'that he was expecting a tax refund of "approximately $100,000," enough to cover his owed and future legal fees,' was a statement respecting his financial condition and properly evaluated under subsection (B).")). Similarly, the revenue (according to the BSR Packet and other written financials directly related to URRD's aggregate financial status. Had Debtor disclosed the actual relevant URRD revenue attributable to vehicle repossessions and other services being sold, and removed or at least truthfully explained the cash infusions and inflated numbers due to vehicle sales or "flips," URRD's aggregate financial condition and lower solvency would have been more readily apparent. Instead, those misrepresentations and omissions were buried in the reported operational financials. These misrepresentations and omissions had a direct relation and impact on the overall financial status and actual financial condition of the business.

### e.  **Reasonable Reliance**

Reasonable reliance requires a finding of actual reliance, as well as "objectively assess[ing] the circumstances to determine whether the creditor exercised 'that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.'" *First Recovery*, 2023 U.S. Dist. LEXIS 5007 at *20-21 (quoting *Sharp*, 340 F. App'x at 908 (citations omitted)).  Factors to be considered include:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit[.]

*Cohn*, 54 F.3d at 1117.

In considering those "surrounding circumstances":

Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship

> with the debtor; (2) whether there had been previous business dealings with debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*BancBoston Mort. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992).

The net result of imposing additional criteria in a subsection (B) in comparison to (A) analysis is to make it more difficult to prove nondischargeability under (B). The Supreme Court recently discussed this dichotomy in *Bartenwerfer v Buckley*, where citing *Field*, *supra*, Justice Barrett speaking for a unanimous Court noted:

> Congress . . . "wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge." This concern may also have informed Congress's decision to limit (B)'s prohibition on discharge to fraudulent conduct by the debtor herself. Whatever the rationale, it does not "def[y] credulity" to think that Congress established differing rules for (A) and (B).

598 U.S. 69, 79 (2023) (internal citation omitted).

Moreover, "'[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act,' we generally take the choice to be deliberate." *Id.* at 78 (quoting *Badgerow* v. *Walters*, 596 U.S. ___, 142 S.Ct. 1310, 1318 (2022)). Consequently, an exception to discharge claim under subsection (B) requires separate analysis even if the same case makes a subsection (A) claim as well.

Performing a fresh subsection (B) analysis, the court notes Plaintiffs and Debtor were not related and had no personal or business relationship from prior dealings before the URRD sale at issue. The absence of such previous relationship calls for a greater need to verify the accuracy of

information represented. Importantly, the BSR also contained the following disclaimer: "The information is provided only as an introduction to the business. The buyer must ultimately complete their own due diligence to determine whether or not to invest in the business." Finally, prior to completing the sale, Debtor denied access to certain URRD records and business operations, including the RDN and bank statements. Despite Mr. Brooks testimony that bank records can be misleading due to the inability of identifying whether certain deposits are revenue, having been denied pre-closing access to the same financials revealing URRD's shortfalls post-closing are "red flags" a reasonable person would have further investigated. *Bogstad*, 779 F.2d at 372 ("[T]he requirement of 'reasonable' reliance . . . surely does not mean that a creditor may 'assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it.'").

Combining the lack of prior relationship between parties, the BSR's disclaimer, and actively being denied access to URRD records and business operations, Plaintiffs, in the exercise of due care imposed upon a reasonable person under the "surrounding circumstances," should have inquired further into the adequacy and truthfulness of the written disclosures. Had Plaintiffs paid sufficient attention to the inconsistencies in the written BSR Packet, they may have identified the pre-closing financial misrepresentations. Additionally, the existence of the unpaid payroll taxes and federal tax lien encumbering URRD's assets weakens Plaintiffs' reasonableness argument. Mr. Brooks became aware of the tax liens pre-closing. His testimony that he relied on Debtor's explanation regarding the towing portion of the business is belied by Debtor's denial of access to critical records of the business Plaintiffs sought to control and operate. Mr. Brooks buried his proverbial head in the sand by continuing with the purchase of URRD after these "red flags" were raised.

Although satisfactory for Plaintiffs' normal business practices, the surrounding circumstances erode Plaintiffs reasonableness' argument. *See Bailey v. Turner (In re Turner)*, 358 B.R. 422, 429 (Bankr. N.D. Okla. 2006) (holding § 523(a)(2)(B) is an objective rather than subjective test…. the issue is not solely establishing whether a plaintiff's standard practices were met; it is whether a reasonably prudent person would have blindly ignored information containing material discrepancies). Plaintiffs failed to satisfy their burden in establishing industry standards in consideration of a commercially reasonable investigation by failing to offer sufficient evidence of industry standards in researching and investigating a sale of a repossession business. Plaintiffs' contention that their lending institution prioritized tax returns, without more, is not sufficient.

Here, the surrounding circumstances analysis reveals that Plaintiffs failed to exercise a degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances. Accordingly, Plaintiffs did not meet their burden in establishing the reasonable reliance element.

### f. **Causation and Intent**[5]

Plaintiffs bear the burden of proving Debtor knew that the statements regarding its financial condition were false and that such false statements were published with the intent to deceive. *Cabarrus Cty. v. Boyd (In re Boyd)*, 525 B.R. 299, 306 (Bankr. M.D.N.C. 2015). Based on the difficulty showing direct proof of a debtor's state of mind, direct evidence of intent to deceive is not required for liability under § 523(a)(2)(B). *Id.* Instead, "a creditor may present evidence of the surrounding circumstances from which such intent may be inferred." *Id.* (citing *In re Adams*, 312 B.R. 576, 586 (Bankr. M.D.N.C. 2004).

---

[5] Having determined that the debt is nondischargeable under subsection (A), and having further determined that Plaintiff did not meet the more burdensome reliance standard for subsection (B) liability, this analysis could end there. However, as mandated by the District Court Order, all elements should be addressed.

The evidence demonstrated Debtor submitted the information used in the BSR Packet to Mr. Martinez at Sunbelt. At Debtor's instruction, Mr. Martinez, acting as Debtor's agent, compiled the information and posted the BSR and financials as a business listing for URRD's sale. Debtor meanwhile caused false revenue statements to be published by obtaining loans to infuse cash into URRD and to give the deceptive appearance of normal and profitable operations for potential buyers to see. Debtor conducted this scheme knowingly and with a motive to sell the business, which he caused to happen.  Sufficient evidence of causation was presented. However, due to the intricacies of subsection (B) as discussed above,  the surrounding circumstances imposed a duty Plaintiffs to investigate the written financial information further, a task which they did not perform.

## CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the claim that the debt is non-dischargeable under Section 523(a)(2)(A) is **GRANTED**. Plaintiffs established by a preponderance of the evidence that Defendant obtained money by making false and fraudulent representations other than a statement respecting its or an insider's financial condition, and that Plaintiffs justifiably relied on those statements.

Plaintiffs, however, failed to establish by a preponderance of the evidence reasonable reliance on material written statements under the surrounding circumstances as required by Section 523(a)(2)(B), and nondischargeability of the debt on this additional and independent basis is **DENIED**.  A separate judgment stating that the $1,300,000 debt owed by Debtor to Plaintiffs is non-dischargeable pursuant to Section 523(a)(2)(A) is entered simultaneously herewith.

### END OF DOCUMENT